STATE EX REL. 'J. E. LARSON v. CITY OF MINNEAPOLIS AND OTHERS.[1]

November 17, 1933.

No. 29,498.

*Herbert T. Park* and *G. A. Youngquist,* for appellant.

*Neil M. Cronin, R. S. Wiggin,* and *Thomas B. Kilbride,* for respondents.

*Fowler, Carlson, Furber & Johnson* and *Paul C. Thomas,* amici curiae, filed separate briefs on behalf of the contention of appellant.

*HILTON, Justice.*

Mandamus to compel the respondents to issue to relator a license to sell pasteurized milk and its products within the city of Minne-

[1]Reported in 251 N. W. 121.

apolis. The question presented involved the constitutionality of a city ordinance. The court upheld the ordinance, denied the relief prayed for, and ordered judgment dissolving the alternative writ. From an order denying a new trial relator appeals.

On March 11, 1932, the council of the city of Minneapolis passed a new milk ordinance to take effect on May 2, 1932. Section III thereof, in so far as here material, is:

"It shall be unlawful for any person to sell within the limits of the city of Minneapolis any pasteurized milk or its products as herein defined unless the same shall have been (1) pasteurized in a pasteurization plant located within the limits of the City of Minneapolis; and (2) pasteurized by the process prescribed by this ordinance; (3) until a license therefor to be known as the 'Minneapolis Pasteurized Milk License,' shall have been issued to such person. * * *"

The ordinance further provides, by section XII:

"Pasteurizing plants operating under a Minneapolis milk license at the time of the passage of this ordinance and located beyond the limits of the city of Minneapolis may upon application and approval be issued a pasteurizing milk license from the first Monday in May, 1932, until December 31, 1932."

Under the last quoted provision relator was licensed to sell pasteurized milk in Minneapolis until the date therein specified. Since then he has not been permitted to do so.

If the ordinance is unconstitutional it must be because it violates the due process clause of art. 1, § 7, of our state constitution and the due process and equal protection clauses of the fourteenth amendment of the federal constitution.

Under its police power a state or its municipalities may enact statutes and ordinances for the welfare and health of its citizens. Such a statute or ordinance, however, must be reasonable and not arbitrary; must not invade the fundamental liberties of the citizen; must, on the one hand, tend to accomplish the purpose of its adoption; and, on the other, must not go beyond the reasonable demands

of the occasion. The burden of showing that an act is arbitrary and unreasonable is on the complaining party. 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1604, and cases cited; 2 Cooley, Constitutional Limitations (8 ed.) p. 1229, et seq. If, as claimed by respondents and found by the court, this ordinance was enacted by the city of Minneapolis for the protection of the health of its citizens, was the prohibition therein contained a reasonable regulation toward that end? We think not.

There is no material controversy as to the facts appearing in the evidence and referred to in the findings of fact and in the court's memorandum made a part thereof. We summarize such facts.

Relator is the owner of a milk pasteurizing plant located at Cologne, Minnesota, about 30 miles from Minneapolis, and has an investment therein of about $70,000. He has operated such a plant for more than 20 years. In addition to the pasteurizing plant he also has a creamery which he has operated for more than 35 years. For 14 months prior to December 31, 1932, he had distributed within Minneapolis, under a license issued by its city council, about 4,000 quarts of pasteurized milk and 400 to 500 pints of pasteurized cream daily, amounting to about 80 per cent of his total output. In the pasteurization process in relator's plant, in full compliance with the requirements of the ordinance, the milk is brought up to 145 degrees and then cooled down to below 40 degrees Fahrenheit, when it is put into bottles, which are automatically capped without coming in contact with human hands, placed in cases which in the summer time are iced and put into insulated trucks, iced again, and in 60 to 70 minutes hauled to relator's refrigerating plant in Minneapolis, where it is kept at a temperature of 40 to 45 degrees until the following morning, when it is delivered to consumers.

The court found that if the requirements of the ordinance relative to the manner of pasteurizing the milk are complied with, and if such products are delivered at distribution points within the city after being placed in proper containers at the conclusion of the pasteurization process and maintained at the temperature prescribed by the ordinance during transportation, the milk will be in as safe and wholesome a condition for use by the consumers to

whom it is promptly delivered from such distribution points as though it had been so pasteurized in plants located within the limits of the city; but that if between the process of pasteurization of the milk and delivery of the same at distribution points the temperature thereof is permitted to rise above 50 degrees Fahrenheit, there is danger that any disease-producing organisms which remain therein undestroyed by the pasteurization process will so multiply as to render such milk unsafe for human consumption, and the hazard of multiplication of such disease-producing organisms is increased in proportion to the length of the interval between pasteurization and delivery for consumption; that the process of transportation in containers as provided by the ordinance does not in itself cause milk to become unwholesome or in any way to deteriorate if the same is kept at a proper temperature.

It is not contended that milk pasteurized outside the city limits and distributed within cannot be kept at all times at a temperature that will reasonably insure its wholesomeness when reaching the consumers. The court, however, found that the inspection necessary to safeguard the public health in that respect "is attended with substantial public expense, which is greater or less according to the distance to be traveled by the inspectors for the purpose of making such inspection." In its memorandum the court states:

"If milk and milk products are in other respects produced, handled, pasteurized, transported and distributed in accordance with the laws of the state and the ordinance in question, the inevitable conclusion from the evidence would be that it makes no difference whether it is pasteurized within or without the city. If this were all the provision here in question would be plainly unreasonable and invalid."

The record discloses that relator has at all times complied with requirements of the city ordinance and state statutes relative to pasteurized milk. The city caused relator's pasteurization plant to be inspected at intervals of approximately once a week, and the results of such inspection were found to be satisfactory according to the requirements of the ordinance. In addition, his plant

was inspected by the state once or twice a year. His product has never been found to be less wholesome than that produced by plants within the city.

The court continues:

"But this is not all. The evidence, which is supported by common knowledge, shows that at all stages the process of pasteurization and the conditions of transportation and distribution need to be watched. For this purpose both the state and the city provide systems of official inspection. It is obvious that adequate inspection is a reasonable precaution. It is obvious that considerations of convenience, efficiency and cost of inspection are proper to be taken into account in determining the question of reasonableness. It is also obvious that there is somewhere a limit of distance beyond which inspection by the city's agents would be too inconvenient, too costly and too likely to be ineffective to be practicable. It seems to me there can be no doubt of the right of the city council to fix a reasonable limit beyond which it will not provide for inspection, and beyond which, for that reason, pasteurization plants will not be licensed. In this ordinance the limit is the boundary line of the municipality."

The issue then is limited to the question of whether or not provision by the city for adequate inspection of relator's pasteurization plant, transportation facilities, etc. is so expensive and inconvenient to the city as to justify prohibition by it of relator's established business unless she moves his pasteurization plant into the city.

At the time of the passage of the ordinance in question there were 13 licensed pasteurization plants outside of the city limits, one of which was located 400 feet therefrom, one four blocks, one 35 miles away, and the others at intermediate distances. The city itself operates one such plant ten miles from its limits from which milk is furnished to the University Hospital, being transported thereto in open, uninsulated trucks. There were 18 pasteurization plants within the city limits, which pasteurized approximately 97 per cent of the milk and 99.1 per cent of the cream consumed in the

city. Three inspectors were employed by the city, one of whom was delegated to the inspection of raw milk and plants producing raw milk, the other two to the inspection of pasteurized milk, inspecting the plants, retail establishments, vehicles in which the milk is delivered to the homes, and collecting and inspecting samples on the street. About half the time of one of these men was required to inspect the pasteurization plants located outside the city limits. The ordinance required that pasteurization plants be inspected at least once a month; the city health commissioner testified that they ought to be inspected at least three times a week. Relator's plant and other outside plants had for some time been inspected once a week. The evidence warrants the presumption that such inspection has been adequate in the past reasonably to insure delivery of a wholesome product to the consumers, and that the city has exercised "reasonable precaution." For such inspection the city has charged a fee of $20 annually. In addition, the ordinance required payment by relator of a license fee of $25, a vehicle fee of $5 for the first vehicle, $2.50 for the second, and $1 for each additional vehicle, annually.

If the inspection fee is deemed insufficient, there appears to be no good reason why such insufficiency cannot be remedied in a manner that would impose no unjust hardship on anyone concerned. There is nothing in the record to show what, if any, inconvenience the city may be put to that would justify such a harsh requirement as provided by the ordinance. We are obliged to hold that the ordinance, in so far as it prohibits the sale of pasteurized milk or its products in the city of Minneapolis unless the same shall have been pasteurized in a pasteurization plant located within the city limits, violated relator's constitutional rights of property and contract. The restriction contained therein goes "beyond the reasonable demands of the occasion" and is not adaptable to the end sought.

Reversed.